UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| MARTIN S. STANCIK, JR., | ) | CASE NO.  1:06 CV 0393 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MEMORANDUM OF OPINION |
| | ) | AND ORDER |
| CNBC, | ) | |
| | ) | |
| Defendant. | ) | |

Pro se plaintiff Martin S. Stancik, Jr. filed suit against CNBC in the Cuyahoga County Court of Common Pleas, Ohio on January 20, 2006.[1]  In the complaint, Mr. Stancik indicates that he is a resident of Berea, Ohio seeking damages in excess of $75,000.00.  CNBC filed a Notice of Removal in this court on February 22, 2006 based on diversity jurisdiction.  In the notice, counsel for CNBC averred that at time the action commenced it was, and still is, a corporation incorporated under the laws of Delaware, with its principal place of business in New Jersey.  Defendant asserts original jurisdiction pursuant to 28 U.S.C. § 1332 based on these facts.

In response to the Notice of Removal, Mr. Stancik filed a motion in this court on

---

[1] The case is captioned, Stancik v. CNBC, No. CV06582219, before Judge Bridget M. McCafferty.

February 27, 2006 to "Deny Removal of this Case to the United States District Court for the Northern District of Ohio Due to Misinformation." In his motion he argues that CNBC failed to acknowledge his "previous filings with the court regarding the Amended Complaint and Complaint." (Mot. at 3.) This amended pleading adds CNBC Board Members Jack Welch, Jeffrey Immelt, Robert Wright, Pamela Thompson-Graham and Mark Hoffman as party defendants. Mr. Stancik notes further that he is seeking one million dollars in punitive damages from each of the defendants. The removal and merits of this action have been briefed and are now before the court.

*Background*

Mr. Stancik describes CNBC as "the world's premier financial network." Because of this purported status, he asserts that the station is "watched daily by the investment department of just about every brokerage firm, mutual fund, hedge fund, insurance company, bank, corporate and private investor etc, world wide for its stock ticker tape, interviews and investment information." (Compl.at 1.)

He claims that CNBC "created an icon called Jim Cramer"in 2004. That year, Mr. Cramer was featured as a co-commentator on CNBC's program, "Kudlow and Cramer." The following year, he appeared solo on CNBC's "Mad Money," wherein he presented his "ideas, opinions, [and] stock recommendations." (Compl. at 2.) Mr. Stancik states that the program is telecast at "6:00 p.m., 9:00 p.m. and 12:00 p.m.," after the stock market closes.[2]

Some time in 2006, Mr. Cramer increased his visibility by also appearing daily on CNBC's program, "Stop Trading," at 3:30 p.m. He claims that Mr. Cramer's show has a

---

[2]The court presumes that the final replay of the program is 12:00 a.m., not 12:00 p.m.

tremendous effect on the final half hour of stock trading, in part, because the market closes at 4:00 p.m. On "Stop Trading," Mr. Cramer "expresses his views on the different stocks trading that day and the market in general, which can be very controversial. At the end of the show, CNBC runs a taped disclaimer distancing CNBC from Cramer's view, and they do not make a 'pro or con' analysis. His comments are not critiqued like they do for other analysts." (Compl. at 2.)

In 2005, Mr. Cramer became very interested in shares of Google stock. He highly recommended purchasing the stock during the time that its share price rose from $85.00 per share to $466.00 per share. However, when other analysts began to recommend purchasing stock in Google, Mr. Cramer "seemed to resent it because they were infringing on something he personally felt strongly about, and he started to express a feeling of negativity about this stock." (Compl. at 2.) Mr. Stansik purchased "10 contracts of Jan 500 calls or 1000 shares on December 16, 2005 for $1500 when they were way-out-of-the-money. They were worth $5000 the first week of January, and with the projections of Google going to between $540 to $600 a share, they could possibly have been worth between $50,000 and $100,000 at the option expiration date." (Compl. at 7.)

It appears that several analysts had high expectations for Google stock prices. On January 3, 2006, an analyst at Piper Jaffray allegedly estimated the stock price to go as high as $600.00 per share in 2006, and two days later, Mark Stahlman of Caris & Co. wrote that the price could sky rocket to $2,000.00 per share. In an article dated January 5, 2006, the Wall Street Journal also agreed that the price could rise as high as $2,000.00 per share. During that first week of January, several analysts predicted that the price would increase to, at least, $600.00 per

3

share in a very short period of time.

When CNBC replayed Mark Stahlman's prediction at 3:00 p.m. on January 5, 2006, Mr. Cramer subsequently criticized him on an episode of "Stop Trading" that day.  After the program, CNBC failed to provide "a 'pro or con' reply to Cramer; instead they followed Cramer's statements on his 'Stop Trading' show with their usual disclaimer." (Compl. at 2.)

On January 8 and 9, 2006, Mr. Stancik sent a facsimile letter to "Jim Cramer, Joe Kernen, Betsy Quick, Liz Clayman and Maria Bartiroma" regarding the Wall Street Journal article. [3]  In the week that followed, Mr. Cramer allegedly remained negative on Google's stock. "[H]e compared this stock and the stock market to the 1999 and 2000 period when the stock market crashed and people lost their life savings.  From 3:30 p.m. on, the market fell.  This fall continued on to the next day, Thursday, January 12th as Google lost over 10 points and the Dow fell 80 points wiping out billions of dollars in stock market value.  This fall was the beginning of a general decline in the market." (Compl. at 4.)  Mr. Stancik maintains that Mr. Cramer's negative comments prompted him to sell his option contract on January 12, 2006 for $1150.00, which netted a loss to him of $350.00.  He asserts that if he had not sold his contract when he did "it would now be worthless when in December it was worth $5000 . . . . This is the 'Cramer Effect'."

---

[3]Other than Jim Cramer, Mr. Stancik does not disclose the identity of the additional parties. The facsimile, attached as Exhibit A to the complaint, is a typed letter under Martin Stancik's signature block, which states, in closing: " Google was at $85 a little over a year ago.  It is now at $465.66 and is growing like a fire-cracker despite thousands of people trying to find fault and knock it down." (Pl.'s Ex. A.)

*Analysis*

In his complaint, Mr. Stancik sets forth three claims for relief: (1) fraud; (2) negligence and (3) violating a public trust.  The underlying basis for these claims, however, rests upon his attack on the legality of the disclaimer CNBC displays at the end of Mr. Cramer's television program.

Citing the "Wikipedia dictionary on the internet" to define what constitutes a "legal disclaimer," Mr. Stancik asserts that the disclaimer CNBC uses is not legal because a legal disclaimer requires that "all steps should be taken to ensure that the information is authentic before making the disclaimer." (Compl. at 4.)  CNBC has allegedly not taken the necessary steps to ensure the authenticity of Mr. Cramer's statements.  This has resulted in what Mr. Stancik refers to as, "the 'Cramer Effect' as he is on CNBC three hours in the evening and on-and-off during the day for about an hour expressing his personal view of the stock market." (Compl. at 4.)

In support of his allegations of fraud, Mr. Stancik asserts that CNBC gives viewers the impression that both sides of an investment are being discussed.  While CNBC allegedly does "just fine" in its "'bull and bear' segments with other analyst[s] . . .  they do not follow this procedure with Cramer's appearance." (Compl. at 4.)  As a result, Mr. Stancik claims that CNBC has abdicated its responsibility to honestly report the "pro and con" of Mr. Cramer's work.  Mr. Stancik claims, without the benefit of any legal support, that CNBC's failure to present an opposing view "as advertised" and running a disclaimer nullifies its effect.

Mr. Stancik alleges that CNBC is liable for negligence because the disclaimer it runs, which may be appropriate for the evening news, is not sufficient in the "fast moving,

computer driven stock market at 3:30 p.m." (Compl. at 5.) He asserts that "[o]ne does not have the time to check with their financial advisor as CNBC suggests; they have to rely on CNBC." (Compl. at 5.)

Finally, Mr. Stancik claims that CNBC should closely supervise Mr. Cramer's television program because the network "disciplined and banned him from their network for using their show "'Squawk Box' to bash certain stocks on the air that he had shorted." (Compl. at 6.)
He claims that CNBC needs to disclose this "problem" in its disclaimer.

*Removal*
*Diversity Jurisdiction*

When, as here, an action is removed based upon diversity jurisdiction, complete diversity of citizenship between the plaintiff and defendants must exist at the time of removal. Coyne v. Am. Tobacco Co., 183 F.3d 488, 492 (6th Cir.1999). The existence of diversity jurisdiction is determined as of the time the action is removed. Rogers v. Wal-Mart Stores, Inc Rogers, 230 F.3d 868, 871 (6th Cir. 2000); Ahearn v. Charter Twp. of Bloomfield, 100 F.3d 451, 453 (6th Cir.1996).

It is undisputed that Mr. Stancik is a resident of Ohio. At the time he filed his complaint in the Court of Common Pleas, CNBC had its principal place of business in New Jersey. Even if the court considered the additional defendants Mr. Stancik names in his amended complaint, none are residents in the State of Ohio. Under these circumstances, the defendant and plaintiff are undisputedly citizens of two different states and this court has diversity of citizenship jurisdiction over plaintiff's complaint. See 28 U.S.C. § 1332(a). Therefore, Mr. Stancik's argument that CNBC failed to consider the additional defendants he named in his

amended complaint has no bearing on the propriety of removing his action to this court.

In a federal diversity action, the amount of damages alleged in the complaint will suffice unless it appears to a legal certainty that the plaintiff in good faith cannot claim the jurisdictional amount. St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288-89 (1938). A court will find absence of the jurisdictional amount to a legal certainty when a state law bars recovery of the type of damages claimed. See e.g. Parmelee v. Ackerman, 252 F.2d 721, 722 (6th Cir.1958) (mental distress damages not includable in computation of jurisdictional amount when barred by state law).

Under the damages section in his original complaint, Mr. Stancik asserted that he suffered an actual loss of $350.00, and a loss of potential profits of $50,000 to $100,000. At the time CNBC removed this action, he sought $350.00 in compensatory damages and $100,000.00 in punitive damages. Thus, it is clear that the availability of punitive damages will dictate whether Mr. Stancik has met the jurisdictional amount.

In Ohio, to recover punitive damages a plaintiff "must establish not only the elements of the tort [e.g., fraud] itself but, in addition, must either show that the fraud is aggravated by the existence of malice or ill will, or must demonstrate that the wrongdoing is particularly gross or egregious." Charles R. Combs Trucking, Inc. v. International Harvester Co., 466 N.E.2d 883, 12 Ohio St.3d 241 (1984) (syllabus para. 3); OHIO REV.CODE Ann. § 2315.21(C)(1) (Anderson 2006). Therefore, this court cannot state at the jurisdictional stage that Mr. Stancik could not recover punitive damages to a legal certainty. Bell v. Preferred Life Assur. Soc., 320 U.S. 238, 240-41(1943); Wood v. Stark Tri-County Building Trades Council, 473 F.2d 272, 274 (6th Cir.1973). Thus, his complaint is sufficient on the issue of punitive damages to

warrant the exercise of subject matter jurisdiction.

*Standard of Review*

The defendant filed a Motion to Dismiss pursuant to Federal Civil Rule 12(b)(6) on February 28, 2006. Mr. Stancik filed a brief in opposition on March 6, 2006. For the reasons set forth below, Mr. Stancik has failed to state a claim upon which this court can grant relief, and the Motion to Dismiss is therefore granted.

*Failure to State a Claim*

a.   Fraud

Under Ohio law, the elements of fraud include: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance. State ex rel. The Illuminating Co. v. Cuyahoga County Court of Common Pleas, 97 Ohio St.3d 69, 776 N.E.2d 92, 97-98 (Ohio 2002). Even if Mr. Stancik sufficiently alleged a fraudulent act, which he has not, it could not be based on an event in the future.

As a general rule, fraud cannot be based on a misrepresentation concerning a future event. See Link v. Leadworks Corp., 79 Ohio App.3d 735, 607 N.E.2d 1140 (Ohio Ct. App. 1992); Tibbs v. Nat'l Homes Constr. Corp., 52 Ohio App.2d 281, 369 N.E.2d 1218 (Ohio Ct. App. 1977); see also Micrel, Inc. v. TRW, Inc., No. 1:02 CV 2539, 2005 WL 1176057 at *7 (N.D.Ohio May 17, 2005). "Mere predictions about the future, expectations, or opinions are not fraudulent misrepresentations unless [they] are fraudulently made."Link, 79 Ohio App.3d at 742,

607 N.E.2d 1140 (quoting <u>Davish v. Arn</u>, Nos. 1607 & 1608, 1940 WL 2980 (Ohio App. 2 Dist. 1940)). Here, Mr. Stancik claims he was 'injured' because the value of his stock option 'would have' increased 'but for' the statements of Mr. Cramer. What is missing from Mr. Stancik's accusation, however, is any false representation of a material fact. Based on the facts alleged in complaint, in Mr. Cramer's opinion, the value of Google stock would decline in the future, and it did. As Mr. Stancik acknowledged himself, Mr. Cramer was like "thousands of people trying to find fault and knock [Google] down." (Pl.'s Ex. A.) Therefore, his own recitation of the facts fails to state a claim of fraud based on Mr. Cramer's predictions.

*b.     Negligence*

In order to bring a negligence action under Ohio law, a plaintiff must establish the existence of a legal duty, see <u>Mussivand v. David</u>, 45 Ohio St.3d 314, 544 N.E.2d 265, 270 (1989), breach of that duty, see <u>Texler v. D.O. Sommers Cleaners & Shirt Laundry Co.</u>, 81 Ohio St.3d 677, 693 N.E.2d 271, 274 (1998), and proximate cause between the breach and the injury that resulted from it. <u>Wellman v. East Ohio Gas Co.</u>, 160 Ohio St. 103, 113 N.E.2d 629, 632 (1953).

The Ohio Supreme Court upheld the dismissal of a cause of action for negligent misrepresentation when a newspaper reader made a securities investment to his detriment when he relied on a negligent and inaccurate report in the Wall Street Journal. See <u>Gutter v. Dow Jones, Inc.</u>, 22 Ohio St.3d 286, 490 N.E.2d 898 (Ohio 1986). In framing the foundation upon which it rested its holding, the Ohio Supreme Court included the following quotation:

> In the absence of a contract, fiduciary relationship, or intentional design to cause injury, a newspaper publisher is not liable to a member of the public to whom all news is liable to be disseminated for a negligent misstatement in

9

> an item of news, not amounting to libel, published by the
> publisher, unless he wilfully originates or circulates it
> knowing it to be false, and it is calculated to and does, as
> the proximate cause, result in injury to another person.

Id., 22 Ohio St.3d at 289, 490 N.E. 2d 898 (quoting 58 Am. Jur. 2d Newspapers, Periodical & Prss Assns. § 148 (1971)).  From this, the court then looked to the elements of tort in the Restatement 2d to distinguish its holding in Haddon View Investment Co. v. Coopers & Lybrand, 70 Ohio St.2d 154, 436 N.E.2d 212 (Ohio1982), wherein an accountant was held liable by a third party whose reliance on the accountant's representation was specifically foreseen, from the facts in Gutter.  The court remarked that liability is limited to "the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it." Id., at 156, n.1 (quoting 3 Restatement of the Law 2d, Torts (1977), 126, 127, Section 552).

In the present case, as in Gutter, there are no facts alleged that would place Mr. Stancik, as a television viewer, "within [the] special limited class (or group) of foreseeable persons as set forth in [Restatement (Second) of Torts § 552(2)(a)]." Gutter, 22 Ohio St.3d at 289, 490 N.E.2d 898.  Although Gutter was based on the written news media, the same reasoning is even more appropriate in this context of broadcast media.  As with Gutter, this court "questions whether appellee's reliance on the news account, without verifying the trading status of the bonds with a broker or otherwise, could ever be considered 'justifiable.'  A contrary result would in effect extend liability to all the world and not a limited class, such as the identifiable and foreseeable group of limited partners in Hadden View Investment Co., supra." Id. (emphasis in original).  There is no basis in law for a negligence claim stated in Mr. Stancik's complaint.

*c.*     *Violating the Public Trust*

Even though cable operators only broadcast material written, spoken, and produced by others, they are still considered to be engaged in protected speech. Hurley v. Irish-American Gay, Lesbian & Bisexual Group, 515 U.S. 557, 570 (1995) (citing Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 636 (1994)).  Moreover, "[a]ll ideas having even the slightest redeeming social importance-- unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion--have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests." Roth v. United States, 354 U.S. 476, 484 (1957).  There is no allegation or inference that CNBC's right to broadcast protected speech should be limited in this context.

Contrary to the generalized statements in Mr. Stancik's complaint, news broadcasters do not owe the general public a heightened duty of care.  "Accuracy in news reporting is certainly a desideratum, but the chilling effect of imposing a high duty of care on those in the business of news dissemination and making that duty run to a wide range of readers or TV viewers would have a chilling effect which is unacceptable under our Constitution." Tumminello v. Bergen Evening Record, Inc. 454 F. Supp. 1156, 1160 (D.N.J. 1978).

There is no statement or reference in the complaint that sets forth a legal claim regarding this issue. Principles requiring generous construction of pro se pleadings are not without limits. Beaudett v. City of Hampton, 775 F.2d 1274, 1277 (4th Cir. 1985). District courts are not required to conjure up questions never squarely presented to them or to construct full blown claims from sentence fragments. Id. at 1278.  To do so would "require ...[the courts] to explore exhaustively all potential claims of a pro se plaintiff, ... [and] would...transform the

11

district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." Id. at 1278.

Further, legal conclusions alone are not sufficient to present a valid claim, and this court is not required to accept unwarranted factual inferences. Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987); see Place v. Shepherd, 446 F.2d 1239, 1244 (6th Cir. 1971) (a pleading will not be sufficient to state cause of action under Civil Rights Act if its allegations are but conclusions).

Based on the foregoing, the complaint is dismissed. Further, the court certifies that an appeal from this decision could not be taken in good faith.[4]

IT IS SO ORDERED.

*/s/Dan Aaron Polster 3/9/06*

DAN AARON POLSTER
UNITED STATES DISTRICT JUDGE

---

[4] 28 U.S.C. § 1915(a)(3) provides: "An appeal may not be taken in forma pauperis if the trial court certifies that it is not taken in good faith."